

**Signed and Filed: February 2, 2022**

_____
**Roger L. Efremsky U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In re
SPECIALTY'S CAFÉ AND BAKERY, INC., ) Case No. 20-40954 RLE
                                    )
            Debtor.                 ) Ch. 7
                                    )
                                    )
                                    )
_____)
LOIS I. BRADY, Ch. 7 Trustee        )
of Estate of Specialty's Café       )
& Bakery, Inc.,                     )
                                    ) Adversary Proceeding
            Plaintiff,              ) No. 20-4039
                                    )
v.                                  )
                                    )
UNITED STATES, SMALL BUSINESS       )
ADMINISTRATION and                  )
CUSTOMERS BANK,                     )
                                    )
            Defendants.             )
_____)

**MEMORANDUM DECISION RE MOTIONS FOR SUMMARY ADJUDICATION**

Before the court are motions for summary adjudication by plaintiff Lois I. Brady, chapter 7 trustee of the estate of Specialty's Café and Bakery, Inc. (the "Trustee" and "Debtor") and defendants Customers Bank ("Customers Bank") and the United

-1-

States of America, Small Business Administration (the "SBA" and collectively with Customers Bank, "Defendants"). As explained below, the court now denies the Trustee's motion and grants the Defendants' motions.

**I. Procedural Background**

On May 27, 2020, Debtor filed this chapter 7 case and the Trustee was appointed.

In September 2020, the Trustee commenced this adversary proceeding and on October 28, 2020, the Trustee filed the First Amended Complaint against Customers Bank and the SBA alleging that (1) on May 7, 2020, Debtor obtained a Paycheck Protection Program loan of $8.1 million from Customers Bank which was guaranteed by the SBA (the "PPP Loan" and the "Program"); (2) on May 13, 2020, Debtor repaid the PPP Loan; (3) Debtor filed bankruptcy two weeks later; and (4) the transfer of $8.1 million to Customers Bank is an avoidable preference under Bankruptcy Code §547 for which both Defendants are liable. Dkt. No. 8, First Amended Complaint.

Defendants filed their Answers, denying the allegations of the First Amended Complaint and asserting, *inter alia*, affirmative defenses of new value under Bankruptcy Code §547(c)(1), ordinary course of business under §547(c)(2), and new value under §547(c)(4). Dkt. Nos. 22 and 25.

The Trustee moves for summary adjudication of certain issues. Dkt. Nos. 51-56. Defendants oppose the Trustee's motion. Dkt. Nos. 63, 66. Defendants also filed their own motions for summary judgment. Dkt. Nos. 57-59, 60-62. The Trustee opposes the

*MSJ Dec.* -2-

Defendants' motions. Dkt. Nos. 64-65. Each party has also filed a reply. Dkt. Nos. 67, 68, 69.[1]

**II. Summary Judgment Standard**

Motions for summary judgment are governed by Fed. R. Civ. P. 56, made applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 7056. Rule 56 provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court views the evidence in the light most favorable to the non-moving party and draws all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, the material facts are not in dispute; the legal implications to be drawn from those facts are in dispute.

**III. Undisputed Facts**

The parties agree on the fundamental events relevant to their respective arguments:

In March 2020, the Coronavirus Aid, Relief, and Economic Stimulus Act (the "CARES Act") was signed into law. Pub. L. 116-136. Pursuant to the CARES Act, the SBA established within its §7(a) loan program the Paycheck Protection Program to assist small businesses adversely impacted by the pandemic. 15 U.S.C. §636(a); Dkt. No. 56, MacConaghy Dec., Ex. 9, 4/15/20 Interim Final Rule; Dkt. No. 60, SBA Motion, Ex. 1, SBA FAQs; *In re*

---

[1] All references are to the court's docket numbers and the pagination in its footers.

*MSJ Dec.*                                    -3-

*Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247-50 (11th Cir. 2020) (describing background re CARES Act and SBA rules and procedures for implementing PPP loans).

PPP loans were funded by various financial institutions and guaranteed by the SBA. In broad strokes, if a PPP loan was used according to the Program's terms - for payroll, rent, utilities, mortgage interest - the loan may be fully forgiven. Dkt. No. 60, SBA Motion, Ex. 1, SBA FAQs.

Debtor was wholly owned by FEMSA/FEMCO and operated approximately 45 restaurants located in class A office buildings. Debtor's business was adversely - and precipitously - affected by the pandemic as shelter-in-place orders were enacted in March 2020, offices closed, and remote work became the norm. Debtor's rental obligations were approximately $1 million per month and, in this climate, its prospects for survival were uncertain. Dkt. No. 56, MacConaghy Dec., Ex. 1, CFO Negrel Depo., p. 11-12.

On April 24, 2020, Debtor signed and then submitted an application for its PPP Loan through loan broker Knight Capital Funding. Dkt. No. 56, MacConaghy Dec., Ex. 7, Loan Application; Ex. 3, Rivero Depo., p. 4.

The Loan Application contained certifications to be made in good faith by Debtor, as borrower, as provided in 13 C.F.R. §120.100-101. These certifications included the statement that "current economic uncertainty makes the loan request necessary to support ongoing operations" and an acknowledgment that "if funds are knowingly used for unauthorized purposes the federal government may hold me legally liable, such as for charges of

*MSJ Dec.* -4-

fraud." It also included a warning that knowingly making a false statement was punishable under the law with various prison terms. Dkt. No. 56, MacConaghy Dec., Ex. 7, Loan Application. The requirement that borrowers assess their "economic uncertainty" included looking at their ability to "access other sources of liquidity sufficient to support their ongoing operations." Dkt. No. 60, SBA Motion, Ex. 1, SBA FAQs.

Because of uncertainty regarding the terms of the Program, and its own future viability, on April 29, 2020, Debtor's CFO asked the loan broker whether funding could be delayed until May 8, 2020 to give Debtor more time to understand the exact terms of PPP loans. Dkt. No. 56, MacConaghy Dec., Ex. 1, Negrel Depo., p. 8:8-24.

On May 5, 2020, Debtor signed the Note evidencing the $8.1 million PPP Loan. Dkt. No. 56, MacConaghy Dec., Ex. 4, Promissory Note.

On May 7, 2020, Debtor received $8.1 million by wire transfer from Customers Bank. Dkt. No. 64, MacConaghy Dec., Ex. 1, p. 1, bank statement.

On May 7, 2020, Debtor's CFO wrote to the loan broker Eric Rivero stating "in light of recent evolution of the PPP guidelines we may decide to return the funds we received this morning ... please let us know asap how we should proceed should we decide to do so." Debtor's CFO also asked for "the complete banking information for the account we should return the funds to." Dkt. No. 56, MacConaghy Dec., Ex. 8, 5/7/20 Negrel-Rivero email exchange. Later that same day, the loan broker advised

*MSJ Dec.* -5-

Debtor's CFO "we haven't had someone ask to cancel and return the funds" and "by tomorrow early afternoon I'll have an answer for you ... for the correct refund process."

On May 7, 2020, Debtor's board of directors met. The board meeting minutes show that the board discussed the PPP Loan and Debtor's eligibility, as well as other issues regarding Debtor's future viability, including a potential bankruptcy filing. An "extraordinary board meeting" was set for May 12, 2020 to continue the discussion of these topics. Dkt. No. 57, Angstreich Dec., Ex. D, 5/7/20 board meeting minutes.

After receipt of the $8.1 million, Debtor maintained this sum within its Wells Fargo bank account infrastructure until it returned $8.1 million to Customers Bank. Dkt. No. 60, SBA Motion, Ex. 6, Negrel Depo., p. 23:8-25:16; Dkt. No. 64, MacConaghy Dec., Ex. 1, p. 1-2, bank statement; Ex. 2, part 2, p. 11-12, operating account bank statement.

On May 12, 2020, Debtor's board of directors held its extraordinary meeting and decided to return the PPP Loan to Customers Bank. Dkt. No. 56, MacConaghy Dec., Ex. 1, Negrel Depo., p. 15:15-16. The minutes of the board meeting state: "In light of the recent changes to PPP eligibility guidance and based on the recommendations from both FEMSA and Specialty's counsel, the Board approved to return these funds to the SBA prior to the May 14th deadline." Dkt. No. 57, Angstreich Dec., Ex. F, 5/12/20 board minutes. Also on May 12, the loan broker finally provided Debtor's CFO Negrel with the instructions for returning the $8.1 million to Customers Bank. Dkt. No. 57, Angstreich Dec., Ex. E ,

*MSJ Dec.*                                               -6-

5/12/20 Rivero email to CFO Negrel.

On May 13, 2020, Debtor returned $8.1 million to Customers Bank by wire transfer. Dkt. No. 56, MacConaghy Dec., Ex. 6, outgoing wire confirmation; Dkt. No. 64, MacConaghy Dec., Ex. 2, part 2, p.12, operating account bank statement.

At the time of this transaction, the Program had a "safe harbor" deadline of May 14, 2020 under which a PPP loan could be canceled by a borrower with no liability for false or misleading certifications made in the loan application process and the borrower would be deemed by the SBA to have made the required certifications in good faith. Dkt. No. 60, SBA Motion, Ex. 1, SBA FAQs. The safe harbor was "necessary and appropriate to ensure a borrower's prompt repayment of a loan obtained based on a misunderstanding or misapplication of required certification standard." 85 Fed. Reg. 23451-23452.

Debtor's CFO explained his understanding of this safe harbor: "As far as I was aware, any money returned prior to the expiration of the safe harbor period would allow any beneficiary of a PPP loan to not be asked any questions about how they applied for the loan, why they applied for it, and to avoid having to answer any questions on that entire process." Dkt. No. 60, SBA Motion, Ex. 6, Negrel Depo., p. 10:13-25.

He also testified about his misgivings regarding taking the PPP Loan: "I always told people, ... this makes no sense. I don't understand how we can say that we don't have access to liquidity. Sometime in March or early April FEMSA voted the distribution of ... several tens of millions of dollars of dividends." As the CFO

*MSJ Dec.* -7-

described it, this prompted him to ask "how can we justify asking for money from the federal government when our shareholder is voting a dividend of that sum." Dkt. No. 60, SBA Motion, Ex. 6, Negrel Depo., p. 29:1-30:11.

Debtor's CFO also testified that "If there hadn't been any safe harbor, I don't think it would have changed any of the decisions we made." Dkt. No. 60, SBA Motion, Ex. 6, Negrel Depo., p. 23:5-7.

On May 17, 2020, Debtor's management announced its decision to shut down as of May 19, 2020. Dkt. No. 56, MacConaghy Dec., Ex. 10, p. 5, expert report timeline.

On May 27, 2020, Debtor filed this chapter 7 case.

**IV. Discussion**

The Trustee contends that she has established all the elements of her preference case under Bankruptcy Code §547(b) other than Debtor's insolvency. She also contends that the undisputed facts show that Defendants cannot establish their affirmative defenses and cannot otherwise defeat her case under Bankruptcy Code §547(b). Defendants disagree.

**A. Avoidable Preference Elements**

Bankruptcy Code §547(b) provides that a trustee may avoid any transfer of an interest of the debtor in property - (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; (5) that enables such creditor to receive more than such creditor would

*MSJ Dec.*                           -8-

receive if - (A) the case were a case under chapter 7 of this title; (B) such transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Trustee has the burden of proving the avoidability of a transfer under §547(b) and Defendants have the burden of proving the nonavoidability of a transfer under §547(c). Bankruptcy Code §547(g). All of these elements must be proven by a preponderance of the evidence. *Arrow Elecs., Inc. v. Justus (In re Kaypro),* 218 F.3d 1070, 1073 (9th Cir. 2000).

There are several elements that are not in dispute. Bankruptcy Code §101(54)(D)'s broad definition of "transfer" covers the wire transfer to Customers Bank. Also, there is no dispute that this transfer took place within 90 days of the petition date as required by §547(b)(4)(A). The Trustee also states that she holds approximately $2.5 million in cash and she estimates that the allowed claims will be in excess of $10 million. As such, this is not a case in which unsecured creditors will receive 100% on their claims as Defendants have. Dkt. No. 55, Brady Dec. Based on this, the Trustee argues she has met the requirements of Bankruptcy Code §547(b)(5) to show that Defendants received more than other similarly situated creditors. Defendants do not quarrel with this statement but their arguments make this issue irrelevant.

**B. Elements in Dispute**

**1. Interest of the Debtor in Property**

The first point of contention is whether the Trustee has

*MSJ Dec.*                                    -9-

established that the $8.1 million was an "interest of the debtor in property" at the time it was transferred to Customers Bank. According to the Trustee, because the $8.1 million was deposited into Debtor's bank account it was *presumptively* Debtor's property for the purposes of preference recovery and Defendants are unable to rebut this presumption.

Defendants counter that Debtor rescinded the PPP Loan, in effect terminating it, and the $8.1 million was then impressed with a resulting or constructive trust. Because property held in trust is not property of the estate, the $8.1 million was not an interest of the debtor in property when it was returned to Customers Bank.

Bankruptcy Code §541(a)(1) broadly defines property of a debtor's estate as including "all legal or equitable interests of the debtor in property." State law determines the extent of an interest in property absent an overriding federal policy. *Butner v. U.S.*, 440 U.S. 48, 55 (1979). Bankruptcy Code §541(b)(1), provides that property of the estate does not include "any power that the debtor may exercise solely for the benefit" of another. Further, §541(d) also excludes property "in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest."

Property held in trust by a debtor for another is neither property of the bankruptcy estate under §541(d), nor property of the debtor for purposes of §547(b). *Begier v. IRS*, 496 U.S. 53, 59 (1990); *In re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir. 1994) (creditor established that funds debtor received by

*MSJ Dec.*                                   -10-

mistake were impressed with a constructive trust and debtor had only bare legal title; burden of proof shifted to debtor to show it would be inequitable under bankruptcy law to impose a constructive trust and debtor failed to do so).

Under California law, a contract may be rescinded by mutual consent. Cal. Civ. Code §1689(a). A contract may also be rescinded unilaterally if the rescinding party's consent was given by, *inter alia*, mistake. Cal. Civ. Code §1689(b). Cal. Civ. Code §1688 says "a contract is extinguished by its rescission." A rescinded contract ceases to exist for all purposes. *Boomer v. Muir*, 24 P.2d. 570, 577 (1933).

To effectuate a rescission, a party must, promptly upon discovering the facts which entitle him to rescind, give notice of intent to rescind, and "restore to the other party everything of value which he has received" or "offer to restore the same." Cal. Civ. Code §1691(b).

Defendants argue that once Debtor rescinded the PPP Loan, the transaction was deemed void *ab initio*. *Little v. Pullman*, 219 Cal. App. 4th 558, 568 (2013). Once Debtor completed the steps in the rescission process, the parties were restored to their former positions. *Mulhall v. Wells Fargo Bank, N.A.*, 241 F. Supp. 3d 1046, 1050 (N.D. Cal. 2017).

The undisputed facts show that on April 29, 2020, Debtor's CFO asked the loan broker if funding could be delayed, and on May 7, the day the PPP Loan funded, he told the loan broker that Debtor was considering canceling the transaction and needed to know how to return the funds. Debtor's board met on May 7 and

*MSJ Dec.* -11-

discussed the issues surrounding the PPP Loan, and met again on May 12 at which point the board confirmed Debtor's decision to rescind the PPP Loan. On May 13, 2020, Debtor performed the law's implied promise to return the $8.1 million to Customers Bank. The undisputed facts in this record show that Debtor rescinded the PPP Loan on May 12 and Debtor then performed as required by transferring - that is, restoring - the $8.1 million to Customers Bank.

The question becomes what is the effect of that rescission. Defendants contend that rescission extinguished the contract such that, at least as of the May 12 decision, the $8.1 million was impressed with a resulting trust or a constructive trust and Debtor then had bare legal title, and no equitable interest in the $8.1 million.

A resulting trust is imposed to carry out the parties' intentions. *In re Sale Guar. Corp.*, 220 B.R. 660, 664 (9th Cir. B.A.P. 1998), *aff'd,* 199 F.3d 1375 (9th Cir. 2000). A constructive trust is an equitable remedy imposed to prevent unjust enrichment regardless of the parties' intentions. Cal. Civ. Code §2223, §2224*; In re Moeller*, 466 B.R. 525, 535 (Bankr. S.D. Cal. 2012) (discussing resulting and constructive trusts, explaining California law defines a trust as a fiduciary relationship with respect to property, title holder has equitable duty to deal with property for benefit of another which arises as result of manifestation of intent to create trust). Clear and convincing evidence is required to rebut the presumption that an owner of legal title also owns full beneficial title. Cal. Ev.

*MSJ Dec.*                                    -12-

Code §662.

The Trustee argues that a constructive trust may only arise where a thing is wrongfully detained or wrongfully acquired and the PPP Loan does not fit this paradigm because there was no wrongful conduct by Debtor in obtaining the PPP Loan, and it was not obtained by accident, mistake or other wrongful act.

The record shows the PPP Loan was not obtained by accident, mistake, or other wrongful act. Defendants' point is that after Debtor rescinded the PPP Loan, the funds were impressed with a trust until they were returned to Customers Bank on May 13. If the $8.1 million had not been returned to Customers Bank, it would *then* have been wrongfully detained - that is, impressed with a constructive trust, or held in contradiction to Debtor's expressed intent to cancel - that is, impressed with a resulting trust.

The Trustee next argues that the constructive trust theory fails here because a constructive trust is merely an inchoate remedy and there must be a prepetition ruling by a court that it exists before this court may recognize it. *In re Advent Management*, 178 B.R. 480, 488 (9th Cir. B.A.P. 1995) (describing need for court determination of constructive trust's existence; but noting that in *Unicom*, the act of litigating the defense established the existence of the constructive trust).

Assuming without deciding that a constructive trust is merely an inchoate remedy that the court may not apply here, under the resulting trust theory the court reaches the same conclusion regarding property of the estate. As explained in *In*

*MSJ Dec.*                    -13-

*re Golden Triangle Cap., Inc.*, 171 B.R. 79 (9th Cir. B.A.P. 1994), cases have at times used the terms resulting trust and constructive trust interchangeably, but determination of "whether bankruptcy's policy of ratable distribution outweighs imposition of a trust depends on whether the trust arises out of intended ownership rights in the property or whether it is to be imposed as a remedy to correct a wrong." 171 B.R. at 82.

On this record, Defendants have shown that a resulting trust arose to carry out the intention of the parties - the return of the PPP Loan to Customers Bank because the transaction had been rescinded and Customers Bank was then the rightful owner of the PPP Loan funds. It is undisputed that Debtor intended to rescind the PPP Loan, did in fact rescind it, and fully performed its obligation to restore ownership of the PPP Loan funds to Customers Bank. The $8.1 million was impressed with a resulting trust as of May 12, 2020. Debtor then held only bare legal title and not an equitable interest in the $8.1 million under Bankruptcy Code §541(d).

The Trustee also argues that Defendants' trust theories fail because they have not, and can not, trace the PPP Loan funds. On May 7, 2020, Customers Bank wired $8.1 million into Debtor's bank account. Dkt. No. 64, MacConaghy Dec., Ex. 1, p. 2. On May 8, 2020, Debtor transferred $8.1 million to its other bank account. Dkt. No. 64, MacConaghy Dec., Ex. 2, part 2, p. 11, "online transfer PPP segregation transfer." On May 13, 2020, Debtor wired $8.1 million from this account to Customers Bank. Dkt. No. 64, MacConaghy Dec., Ex. 2, part 1, p. 52. The Trustee argues that

*MSJ Dec.*                                          -14-

even though Debtor received $8.1 million on May 7, it transferred only $8,049,000 to the other account on May 8 which shows that Debtor did not segregate the PPP Loan funds and spent some of it thus defeating Defendants' tracing requirement. Defendants respond that this is a misunderstanding of the relevant bank statements and Debtor in fact segregated the $8.1 million and at all times maintained it. *See* Dkt. No. 69, SBA Reply, p. 8-9. The court finds Defendants' analysis of this issue convincing and concludes that Defendants have met their obligation to trace the PPP Loan funds. As such, the $8.1 million was held in trust and was not an interest of the debtor in property when it was returned to Customers Bank on May 13, 2020. This is a fatal flaw in the Trustee's §547(b) case.

## 2. For or on Account of Antecedent Debt

The Trustee argues that the PPP Loan created a debt, as that term is defined in the Bankruptcy Code, which arose when Debtor signed the Note on May 5, 2020; Debtor paid this debt on May 13, 2020 - making it the payment of an antecedent debt to or for a creditor for purposes of satisfying §547(b)(1) and (b)(2).

Bankruptcy Code §101(12) defines a debt as "liability on a claim." Bankruptcy Code §101(5), in turn, defines a claim as "a right to payment whether or not it is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

Customers Bank tries mightily to avoid this straightforward analysis but fails in this endeavor. The fact that the Note provided a six month delay for payment to begin or that the PPP

*MSJ Dec.*                    -15-

loan may ultimately have been fully forgiven is irrelevant. Ninth Circuit authority defines antecedent debt as the Trustee contends. *In re Futoran*, 76 F.3d 265 (9th Cir. 1996) (payment of future spousal support obligation was payment of antecedent debt).

However, none of this matters. The court agrees with the SBA that there is, in fact, no debt here. By the terms of the Paycheck Protection Program, Debtor had the right to terminate its PPP Loan and return the borrowed funds to the lender in the safe harbor period - no questions asked. Debtor took advantage of this as permitted by the rules then in place. As a matter of contract law, Debtor did not pay a debt when it wired $8.1 million to Customers Bank on its terminated PPP Loan. The $8.1 million was returned because, at that point, it was the property of Customers Bank. The PPP guidelines permitted Debtor to terminate the transaction. It did so and performed as permitted under the applicable PPP guidelines.

The Trustee argues that Debtor had an obligation to make restitution once it rescinded the PPP Loan. *See* Cal. Civ. Code §1692 (a claim for damages is not inconsistent with a claim for relief based upon rescission; the aggrieved party shall be awarded complete relief, including restitution of benefits...) The Trustee asserts that, conceptually, the obligation to make restitution is itself within the Bankruptcy Code's definition of a debt. This argument is not convincing in the context of this case. Outside of bankruptcy, if Debtor had not performed as it did, and had then been sued, a claim for restitution may have

*MSJ Dec.*                                      -16-

been stated in order to provide "complete relief." However, Debtor's rescission extinguished the PPP Loan and Debtor then fully performed within three business days by returning the $8.1 million to Customers Bank.

The Trustee has failed to prove there was a payment to a creditor for or on account of an antecedent debt as required under Bankruptcy Code §547(b)(1) and (b)(2). For this additional reason, her motion must be denied.

## C. Affirmative Defenses

### 1. Ordinary Course of Business

Even though the court has found that the Trustee has not established certain required elements of her §547(b) case, the court will briefly address the Defendants' ordinary course of business defense under §547(c)(2) to explain why it concludes that this transaction meets the Bankruptcy Code §547(c)(2) ordinary course of business defense.

This defense requires Defendants to prove that the transfer of the $8.1 million was to pay a debt incurred by Debtor in the ordinary course of business or financial affairs of Debtor and Defendants, and the transfer was either (A) made in the ordinary course of business or financial affairs of Debtor and Defendants, or (B) made according to ordinary business terms. Bankruptcy Code §547(c)(2).

The Trustee argues that Defendants cannot meet the first step of showing that this was a debt incurred in the ordinary course of business or financial affairs for Debtor and the Defendants simply because it was a PPP Loan and this Program was

*MSJ Dec.*                                    -17-

only established in response to the pandemic caused by Covid-19 - an extraordinary event. That is true as far as it goes. However, the Program was part of the SBA's well-established §7(a) lending program and was subject to a defined set of rules and guidelines for both borrowers and lenders. As such, the Program was based on overarching "ordinary" terms and conditions even though it was implemented in response to the major disruption caused by the Covid-19 pandemic. The court agrees with Defendants that this PPP Loan was obtained in the ordinary course of business or financial affairs of Debtor and Defendants. There were no extraordinary or aberrational aspects to this short-lived relationship between Debtor and Defendants.

The Trustee next argues that Defendants have not met §547(c)(2)(A)'s requirement that they establish - with competent evidence - that the challenged transfer to Customers Bank was made in the ordinary course of business or financial affairs of Debtor and Customers Bank.

This element of the defense traditionally involves an analysis of the payment history between a debtor and a creditor but if the case involves a one-time transaction between them, the task differs. The court is to look to transactions between similarly situated parties not sliding into bankruptcy. *In re Ahaza Systems, Inc.*, 482 F.3d 1118, 1125 (9th Cir. 2007). The Trustee argues that the loan broker Eric Rivero's testimony establishes her point because his email to Debtor's CFO said Debtor was the first to ask for instructions on how to return a PPP loan, and, in his experience, canceling this sort of loan was

*MSJ Dec.*                                    -18-

rare. This is not convincing in light of the safe harbor rules that permitted Debtor to do exactly what it did. Any similarly situated party could have done the same thing. This made the transfer one that fits the definition of one made in the ordinary course of business or financial affairs of Debtor and Defendants.

The Trustee also argues Defendants have not met §547(c)(2)(B)'s requirement that they prove this transfer was made according to ordinary business terms. "Ordinary business terms" means terms employed by similarly situated debtors and creditors facing the same or similar problems. In *In re Jan Weilert RV, Inc.,* 315 F.3d 1192, 1195 (9th Cir. 2003), the Ninth Circuit held that "ordinary" means terms that are ordinary for companies in financial distress, and terms that are not an "aberration" in the relevant industry.

The Trustee argues that Defendants can not prove this transaction is within ordinary business terms because (1) Defendants have failed to provide expert testimony regarding the relevant industry; (2) the record shows that this transfer was an aberration because it was the pre-payment of the PPP Loan; and (3) the transfer was made in response to threats of civil or criminal liability because Debtor's CFO expressed concern regarding his risk exposure for making the certifications in the loan application.

First, expert testimony regarding industry standards is not required here. In *Weilert*, the debtor had refunded a creditor's mistaken double payment within three days. The Ninth Circuit dismissed the argument that an industry expert was needed on

*MSJ Dec.*                                                    -19-

ordinary business terms in this context, explaining that more evidence of ordinariness was not required because no industry standard could be more stringent than this debtor's performance in three business days. The Ninth Circuit recognized that the law does not inflexibly demand form over substance. *Weilert,* 315 F.3d at 1200.

This court is bound to follow this approach. Debtor wired $8.1 million to Customers Bank within three business days of receipt. This was done according to the safe harbor deadline then in place based on Debtor's recognition that it did not make sense to keep this loan. The Rivero testimony does not take this transfer outside ordinary business terms and does not support a finding that it was an aberration. No additional evidence is needed here.

The Trustee's other arguments also lack merit. This transfer was not a pre-payment as in *In re Schick*, 234 B.R. 337 (Bankr. S.D.N.Y. 1999) which the Trustee cites. Nor was this transfer made in response to threats made by a creditor to cut off a commercial relationship - a pattern in many preference cases. Debtor's CFO was justifiably concerned about the accuracy and ambiguities in the required certifications as well as the soundness of the business reasons to enter into this transaction. But this is a far cry from a creditor threatening a debtor to extract payment resulting in a departure from their previous business terms.

### 2. New Value

Both Defendants asserted affirmative defenses based on new

*MSJ Dec.*                                    -20-

value under Bankruptcy Code §547(c)(1) and (c)(4) in their Answers. Dkt. No. 22, 2nd and 4th affirmative defenses; Dkt. No. 25, 3rd and 5th affirmative defenses. The Trustee seeks summary adjudication on these affirmative defenses. Defendants' describe this theoretical new value as the value conferred by the safe harbor - that is, the waiver of any investigation into the loan application process and the release from any civil or criminal liability.

In relevant part, Bankruptcy Code §547(a)(2) defines new value as "money or moneys worth in goods, services, or new credit." The court need not reach this issue but the Trustee is correct that these affirmative defenses most likely fail.

### 3. Policy Arguments

Both Defendants argue that there are policy reasons regarding PPP loans and the CARES Act that should defeat preference recovery under Bankruptcy Code §547 and warrant a ruling in their favor. Dkt. Nos. 57, 60, 63, 66, 69. The Trustee disputes each of the Defendants' arguments and points out that the policies underlying Bankruptcy Code §547 mandate a ruling in her favor. Dkt. Nos. 53, 65, 67. The Bankruptcy Code's policy in favor of ratable distribution is fundamental. The CARES Act policy to support ongoing businesses struggling to survive in the pandemic is equally fundamental. However, the court need not pit these two policies against each other. This Debtor chose not to continue to operate and recognized that the PPP Loan did not make sense for it and acted appropriately. It is difficult to criticize the decision to apply for the PPP Loan and the decision

*MSJ Dec.*                                    -21-

to change course. It is also difficult to criticize the Trustee for bringing this adversary proceeding. The court's decision was not an easy one.

**V. Conclusion**

Defendants have established that Debtor rescinded the $8.1 million PPP Loan. The $8.1 million was then impressed with a resulting trust. As such, under Bankruptcy Code §541(d), Debtor held only legal title and not an equitable interest in the $8.1 million when it was transferred to Customers Bank. The $8.1 million would have been excluded from property of the estate under Bankruptcy Code §541 if it had not been transferred prepetition. Therefore, it is not an interest of the debtor in property for purposes of Bankruptcy Code §547(b). Defendants have also established their ordinary course of business defense under Bankruptcy Code §547(c)(2). For these reasons, the Trustee's motion is denied and Defendants' motions are granted. An order will follow.

**\* \* \* End of Decision \* \* \***

*MSJ Dec.* -22-

**Court service list:**

all parties by ecf

*MSJ Dec.* -23-